**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth E. HADDOCK, Defendant–
Appellant.**

Nos. 93–3034, 93–3157.

United States Court of Appeals,
Tenth Circuit.

Dec. 13, 1993.

Rehearing Denied March 2, 1994.

Samuel Rosenthal, Curtis Mallet–Prevost, Colt & Mosle, Washington, DC, for defendant-appellant.

Kurt J. Shernuk, Asst. U.S. Atty. (Randall K. Rathbun, U.S. Atty., with him on the briefs), Kansas City, KS, for plaintiff-appellee.

Before SEYMOUR, BARRETT, and ANDERSON, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Kenneth Haddock appeals his sentence and the district court's denial of his petition under 28 U.S.C. § 2255 alleging ineffective assistance of counsel. We remand for resen-

tencing, but we affirm the district court's denial of Haddock's § 2255 petition.

## BACKGROUND

We will not relate the facts of this case in detail because we have previously done so in resolving Haddock's direct appeal. *See United States v. Haddock*, 956 F.2d 1534 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992). In that opinion, we affirmed Haddock's conviction on counts two through seven, nine, and ten, but we reversed Haddock's sentence and remanded for resentencing because the district court had enhanced Haddock's sentence on the basis of Haddock's gain rather than his victims' loss. *Id.*

Briefly, Haddock was chairman of the board and chief executive officer of the Bank of White City, as well as president and sole shareholder of First Finance, Inc., which he formed for the purpose of acquiring loans from the FDIC. He was convicted of six counts of bank fraud under 18 U.S.C. § 1344, one count of filing a false financial statement in violation of 18 U.S.C. § 1014, and one count of concealing relevant information from the FDIC in violation of 18 U.S.C. § 1007, all committed in the process of buying and selling loans for First Finance.

*Count two.* In May, 1987, Kaw Valley State Bank loaned First Finance $711,000. When Haddock applied for the loan, he gave Kaw Valley a copy of his personal financial statement that failed to list $10,000 that Haddock owed to First Finance and a $350,000 open credit line from First Finance to Haddock.

*Count four.* Kaw Valley's $711,000 loan to First Finance was to be secured by a purchase money security interest in the Easton loans. Haddock therefore signed an affidavit that the loan proceeds would be used to buy the Easton loan package. Haddock also showed Kaw Valley a copy of a check that he misrepresented to be the check First Finance had used to buy the Easton loans. Despite his representations, Haddock actually used $250,000 of the loan proceeds to refund the Bank of White City's down payment for rights to buy the Easton loans, and

$55,000 for himself. Nevertheless, First Finance did buy the Easton loan package for roughly the same price Haddock reported to Kaw Valley.

*Count three.* First Finance bought the Easton loans intending to resell them to the Bank of White City. White City initially gave Haddock a $250,000 cashier's check as a "downpayment on exclusive purchase rights" for the Easton loan package. Haddock spent roughly $200,000 of that down payment on an unrelated transaction and the rest on a house for himself. He subsequently returned the $250,000 out of the $711,000 Kaw Valley loan.

*Count five.* White City later entered into a new agreement with First Finance, in which White City gave $350,000 as a down payment for exclusive rights to purchase the Easton package. However, Haddock did not disclose that he had already pledged the Easton loans to Kaw Valley as security for the $711,000 loan to First Finance.

*Count six.* In October, 1987, White City gave Haddock $273,500 to buy another group of loans, the Nortonville package. That amount covered the entire purchase, and White City understood from Haddock that it was buying the entire package. Nevertheless, Haddock delivered to White City only twelve of twenty-nine loans, two of which he later repurchased for $92,000.

*Count seven.* Haddock also used the Nortonville purchase as collateral for a $94,000 loan from Kaw Valley to First Finance. He fraudulently pledged the entire Nortonville package as security for the loan, even though White City had bought twelve of the loans. Haddock also showed Kaw Valley a copy of a First Finance check for $200,000 that he misrepresented to have been used to buy the Nortonville loans.

*Count nine.* Later in 1987, White City agreed to buy the Galena loan package from First Finance. White City gave Haddock a total of $120,766.45 for the purchase. Haddock led White City to believe that First Finance paid $95,766.45 for the loans; the parties agreed that the remaining $25,000 was a servicing fee for First Finance. The actual cost of the Galena package was only $70,766.45.

*Count ten.* Finally, during an FDIC investigation, Haddock altered some of the check stubs in the First Finance checkbook, changing some deposits and eliminating substantial overdrafts during two months in 1987.

Before trial, Haddock produced for his attorney, Carl Cornwell, copies of five documents that corroborated Haddock's testimony and disproved almost all of the counts against him. Although Cornwell knew that the government would challenge their authenticity, he accepted Haddock's assurances that they were authentic and relied heavily on the five documents. With little or no investigation of their testimony, he decided that several possible witnesses would not add much to Haddock's defense and that it would be best to keep the case simple and rely on the five documents and Haddock himself. The trial judge refused to admit the five documents, however, and the jury found Haddock guilty on all counts.

## DISCUSSION

### I. Ineffective Assistance of Counsel

■ The district court held that Haddock's counsel was effective. We must accept the district court's underlying factual findings unless clearly erroneous, but we review de novo whether counsel's performance was legally deficient and whether any deficiencies prejudiced Haddock. *See United States v. Whalen,* 976 F.2d 1346, 1347 (10th Cir.1992); *United States v. Miller,* 907 F.2d 994, 997 (10th Cir.1990).

■ To prove ineffective assistance of counsel, Haddock must show that his trial counsel committed serious errors in light of "prevailing professional norms" and that there is a "reasonable probability" that the outcome would have been different had those errors not occurred. *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984); *see also Lockhart v. Fretwell,* — U.S. —, — — —, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993) (emphasizing that prejudice also requires that errors produced an unfair or unreliable trial). That proof must overcome the "strong presumption" that counsel was

effective. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

### A. Adequacy of Counsel's Performance

The Supreme Court has observed that often it may be easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient. *Id.* at 697, 104 S.Ct. at 2069–70. We believe that is true in this case, and we reject most of Haddock's claims for lack of prejudice. However, two of Cornwell's alleged errors clearly were not legally deficient.

#### 1. Failure to Present an Opening Statement

■ Haddock argues that Cornwell's failure to present an opening statement was deficient performance because Cornwell's only reason for waiving the statement was that he did not know what Haddock would say at trial. *See* J.A. Vol. I at 490. The failure to present an opening statement itself is not ineffective assistance. *United States v. Miller,* 907 F.2d 994, 1000 (10th Cir.1990). Cornwell's uncertainty about what Haddock would say justified Cornwell's strategic decision and was not itself an error. Cornwell was uncertain not because he had inadequately discussed Haddock's account of the events, but simply because he was not sure what Haddock would decide to say when put on the witness stand. *See United States v. Haddock,* No. 90–20075–01, slip op. at 3 (D.Kan. May 14, 1993) (finding that Cornwell and Haddock met "on a number of occasions" for one and one-half to two hours and longer on weekends). Cornwell's failure to present an opening statement therefore did not fall below prevailing professional norms.

#### 2. Failure to Object to Improper Evidence

■ Haddock cites two instances in which Cornwell failed to object to improper evidence. In one instance, he failed to object to hearsay about what the bank examiners were told. Appellant's Br. at 39. In another, he failed to object to the bank examiner's summary of Patricia Fells' testimony. *Id.* at 40. Failure to object on these two occasions did not make Cornwell ineffective. *See Yar-*

*rington v. Davies,* 992 F.2d 1077, 1080 (10th Cir.1993) ("Mere failure to object to evidence does not render an attorney ineffective."). The Sixth Amendment does not guarantee an errorless trial, and "prevailing professional norms" do not require perfection at trial. *See Denton v. Ricketts,* 791 F.2d 824, 828 (10th Cir.1986).

### B. *Prejudice*

#### 1. Failure to Interview Witnesses

On appeal, Haddock complains that he was prejudiced by Cornwell's failure to interview four witnesses that Haddock had identified for Cornwell: Teal Dakan, Bob Unruh, Gary Stafford, and Gloria Stafford.[1] Even if Cornwell's decision not to investigate their testimony did not meet prevailing professional norms, we hold that Cornwell's failure to investigate did not prejudice Haddock.

■ *Teal Dakan.* Haddock argues that failure to interview Teal Dakan, White City's accountant, was prejudicial for two reasons. First, Dakan would have testified that his conversations with Haddock should have led Haddock to believe in good faith that it was proper to use the loan portfolios as collateral for third-party financing. *See* J.A. Vol. I at 225–26; J.A. Vol. II at 496A. Second, Dakan would have rebutted counts three and five by testifying that Haddock reasonably should have believed that Haddock could use the White City down payments for purposes other than acquiring the Easton portfolio. *See* J.A. Vol. I at 224–25.

Haddock does not say what counts might have been decided differently had Dakan testified that Haddock believed from their discussions that he could use the Easton portfolio as collateral for third-party financing. The only counts to which this testimony appears to be relevant are count five and possibly count six, although count six deals with the Nortonville package rather than the Easton package. However, count five relied not on Haddock's use of the Easton package as collateral, but on his fraudulent inducement of White City to enter the agreement by promising exclusive purchase rights without disclosing that the loans were already pledged to Kaw Valley as collateral. Dakan's testimony might have convinced a jury that Haddock believed it was legal to use the portfolio as collateral, but not that it was legal to induce White City into a deal for exclusive purchase rights while concealing Kaw Valley's existing interest in the loans. Dakan's testimony also would not have changed the outcome of count six, because that count was based not on the use of the untransferred loans as collateral, but on Haddock's promise that White City would receive all of the Nortonville loans while Haddock only transferred twelve of twenty-nine loans.

We also do not agree that there is a reasonable probability that the outcome of counts three and five would have been different had Dakan testified that Haddock reasonably should have believed that he could use the down payments for any purpose. Dakan did not talk to Haddock about this question generally or specifically before the transactions. He therefore could not have testified that Haddock relied in good faith on Dakan's professional judgment. Rather, he could only say that his interpretation of the written agreement concerning the second down payment would not restrict Haddock's use of the down payment. Even if such testimony were admissible, it would not rebut Patricia Fells' specific testimony that the parties understood that Haddock would use the money only for the loan purchases. Furthermore, Dakan did not testify at the hear-

---

1. In his discussion of prejudice resulting from this failure, Haddock also mentions the prejudice resulting from Cornwell's failure to use the minutes of a meeting between White City and bank examiners and to question the bank examiner about a favorable statement in his FBI interview form. Haddock complains of the resulting prejudice without ever explaining how these decisions were the result of deficient performance. Unlike the failure to interview the witnesses, neither involves the failure to investigate; Cornwell had examined the minutes and the FBI interview form and had talked to the bank examiner more than once before trial. J.A. Vol. I at 355, 374–75. Haddock has not overcome the presumption that these decisions were based on trial strategy and were within the "wide range of professionally competent assistance." *See Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. We therefore do not consider any additional prejudice due to these two decisions.

ing about his understanding of the original $250,000 down payment, which was the basis of count three, but only about the $350,000 down payment involved in count five. On direct appeal we affirmed the sufficiency of the evidence on count five because Haddock falsely represented that White City would have exclusive rights to the Easton loans even though he had already pledged the loans as collateral to Kaw Valley. *Haddock*, 956 F.2d at 1552. Dakan's testimony could not have rebutted the fact that the loans were already pledged or that Haddock represented that White City would have exclusive rights to the Easton loans.

■ *Bob Unruh.* Haddock argues that failure to investigate Bob Unruh's possible testimony was prejudicial because Unruh would have rebutted count five by testifying that White City officers knew that Haddock and First Finance were dealing with Kaw Valley. *See* J.A. Vol. I at 237–38. However, Unruh could not have testified that White City officers specifically knew that Kaw Valley had financed Haddock's purchase of the Easton portfolio. Unruh's testimony therefore would not have changed the outcome of count five. He could have persuaded the jury only that White City knew Haddock had business dealings with Kaw Valley. That would not rebut the evidence that Haddock concealed Kaw Valley's interest in this particular purchase. Without citing the transcript, Haddock claims that Patricia Fells, a White City officer, testified that she had no idea Haddock was dealing with Kaw Valley at all, and argues that Unruh at least could have impeached Fells. Appellant's Br. at 28–29. Fells was not the only witness from White City, however, and in any event we do not think it reasonably probable that if the jury thought Fells was exaggerating her ignorance of Kaw Valley that it would have believed Haddock without testimony from anyone else that White City knew Kaw Valley had already financed the Easton package.

■ *Gary and Gloria Stafford.* Finally, Haddock argues that the failure to interview the Staffords, employees of First Finance, prejudiced him because they could have discredited government witnesses on counts five and six. First, they could have testified that

White City must have known about the Kaw Valley financing of the Easton portfolio purchase. Second, they could have testified that White City knew it was buying only part of the Nortonville loan package.

The Staffords could not have testified that White City officers knew before making the down payment that Haddock had pledged the Easton loans to Kaw Valley. Rather, they could have testified only that after White City had already entered the agreement with First Finance, White City did not question letters, documents, and actions that suggested that White City was not buying the loans directly from the FDIC and that Kaw Valley had an interest in the loans. *See* J.A. Vol. I at 267–69. Haddock implies that the jury might have inferred that White City must have known about the Kaw Valley financing beforehand, or else they would have expressed surprise when they were told that Kaw Valley had original loan documents or when First Finance was listed as the lender.

We do not think such an inference would have been reasonably probable. The Staffords did not know what Haddock had told the banks, nor did they know what the parties understood before the deal was made. The mere fact that White City did not write or call the Staffords at First Finance to question why Kaw Valley would have original loan documents or why First Finance was listed as a lender is not inconsistent with the testimony of the White City officers. We therefore do not think it is reasonably probable that the Staffords' testimony would have changed the jury's belief in the White City officers' testimony.

We also do not think it is reasonably probable that the Staffords' testimony would have changed the jury's opinion that White City thought it was buying all of the Nortonville loans. The Staffords would not have testified that they somehow told White City that they were only getting some of the loans. Rather, they would have testified that "as far as they knew," White City knew it was buying only part of the Nortonville portfolio. J.A. Vol. I at 301, 363. That alone is hardly persuasive testimony. They also might have testified that White City officials helped review the Nortonville loans at the FDIC office

in Kansas City. *Id.* at 257–61, 293–97. However, Gary Stafford could not remember very well who was there, and the record of Gloria's earlier FBI interview did not mention that any White City officers had helped review the loans in Kansas City. Furthermore, even if the jury believed their testimony, it would not directly prove that White City knew that it was not going to receive all of the Nortonville loans. Again, the Staffords had no idea what Haddock had told White City officers about what they were doing in Kansas City or how the loans would be delivered to them. The Staffords could do no more than testify that they themselves understood what was going on and that they had no reason to think White City did not.

### 2. Failure to Investigate Admissibility of Documents

Haddock complains that Cornwell relied only on Haddock's testimony to admit the five documents even though Cornwell knew he would need the testimony of a custodian of the five documents in order to admit them under the business records exception to the hearsay rule. As the government points out, however, the prosecution never argued that the documents were inadmissible hearsay. This error could not possibly have prejudiced Haddock because no hearsay challenge was ever raised.

The court refused to admit the five documents because they were copies and the government had raised a genuine question about their authenticity. *See* Fed.R.Evid. 1003; *Haddock,* 956 F.2d at 1545. We are convinced that Cornwell could not have adequately proved their authenticity even if he had subpoenaed the banks, checked the government repository, or consulted a document expert as Haddock now urges Cornwell should have done. No other witness besides Haddock testified that he or she remembered seeing an original or a copy of any of the five documents. *Haddock,* 956 F.2d at 1545–46. Witnesses also testified that several of the documents varied from similar documents typically prepared at the banks. *Id.* at 1546. The banks had already indicated that they did not have copies or originals. J.A. Vol. I at 464–65.

Haddock seems to suggest that he was prejudiced because had Cornwell investigated further, he would have realized that he could not rely so heavily on the five documents and would have pursued a different strategy at trial. The only reasonable alternative, however, would be reliance on the witness testimony discussed earlier. Preventing reliance on those witnesses did not prejudice Haddock because, as we have already explained, the available witness testimony would not have changed the outcome.

### 3. Failure to Request Good Faith Instructions

We reversed counts one and eight on direct appeal because the district court had refused to give a good faith instruction on those counts. *Haddock,* 956 F.2d at 1546–48. We did not consider whether a good faith instruction would have been proper for counts two and ten because Haddock had not requested such instructions. *Id.* at 1546. Haddock reasons that Cornwell's failure to request such instructions prejudiced him because those counts also require good faith instructions.

Of course, the question now is not whether we would have reversed counts two and ten for failure to give a requested good faith instruction. The question is simply whether there is a reasonable probability that the jury would have found in Haddock's favor on those counts had a good faith instruction been requested and given. This standard is more demanding than the harmless error standard we applied on direct review of the district court's decision, which requires reversal if a reasonable jury could have believed Haddock's good faith defense. *Haddock,* 956 F.2d at 1547; *see also Lockhart,* —— U.S. at —— n. 2, 113 S.Ct. at 843 n. 2 (distinguishing harmless error analysis from prejudice analysis in ineffective assistance claim).

Haddock does not explain why he thinks the jury would have accepted a good faith defense on count ten, but he does argue that the jury could have accepted his good faith defense on count two. He explains that the unlisted $10,000 loan was less than one

percent of his net worth and he easily could have overlooked it, as he testified at trial. A Kaw Valley official also testified that the loan was unimportant because it was from Haddock's own company. Appellant's Br. at 36. As the district court pointed out, however, all of this evidence was before the jury; Cornwell did not fail to make a good faith defense, he only failed to request a good faith instruction rather than arguing the defense under the instruction regarding specific intent. We do not think that there is a reasonable probability that the jury would have decided differently had the instruction been given, because the defense and evidence were clearly before them even without the instruction. *Haddock,* No. 90–20075–01, slip op. at 19–20.[2]

### 4. Failure to Investigate Accounting Practices

 Haddock claims that Cornwell fell short of prevailing professional norms by failing to investigate accounting practices that justified Haddock's omission of a loan from First Finance on a personal financial statement he submitted to Kaw Valley to obtain a loan. Haddock had borrowed $10,000 from First Finance and also had a $350,000 line of credit with First Finance, but did not list these in the Kaw Valley financial statement.

Haddock argues that Cornwell should have discovered accounting practices that justify omitting loans between a parent and a subsidiary on a consolidated balance sheet. Even if this were legally deficient performance, we do not think Cornwell's failure to discover such accounting principles prejudiced Haddock. Although Haddock asserts that his statement was a consolidated balance sheet, he does not include the statement in

the record on appeal. We therefore assume that it was a "personal financial statement," as it has been consistently called. *See Haddock,* 956 F.2d at 1550. The principles he cites therefore would not justify omitting the loan and credit line in his personal financial statement. Furthermore, as we previously observed, "[b]ecause the loan was made to First Finance and because the bank relied on the strength of Haddock's personal financial position, the frequent transfer of funds from First Finance to Haddock certainly was relevant to a complete evaluation of First Finance's creditworthiness by the bank." *Id.* at 1551. Haddock's analogy to consolidated balance sheets of parents and subsidiaries, where obligations between the two are genuinely irrelevant, therefore does not apply to this situation.

### 5. Failure to Object to Count Ten of Indictment

Haddock's final allegation of ineffective assistance is that Cornwell did not object to the indictment's use of language from the newer version of 18 U.S.C. § 1007, the statute involved in count ten. The newer version prohibits "inviting reliance on a false ... statement," whereas the older version only prohibits making a false statement, knowing it to be false. On direct appeal, we held that the indictment was not defective and did not charge an ex post facto crime. *Haddock,* 956 F.2d at 1542–43.

 We hold that Cornwell's failure to object before trial did not prejudice Haddock. First, we agree with the district court that even a pretrial objection would have been rejected on the same grounds, even though we would not construe the indictment

---

2. Haddock also briefly complains that Cornwell failed to request that the good faith instructions that were given on the other counts state that the jury must acquit even if it finds that defendant's belief was unreasonable. *See Cheek v. United States,* 498 U.S. 192, 202, 111 S.Ct. 604, 610–11, 112 L.Ed.2d 617 (1991). Haddock acknowledges that *Cheek* was decided after the trial, but says it was consistent with prior cases from the Tenth Circuit, without citing those cases. Even if Cornwell's failure to request such instructions was deficient performance, Haddock never attempts to demonstrate any resulting prejudice, nor is it obvious that the jury might have acquit-

ted Haddock had the court given such instructions. As far as the record on appeal shows, the government consistently argued and attempted to prove that Haddock knew he was violating the law and thus tried to conceal his criminal activities. If the jury disbelieved Haddock and accepted the government's evidence, the jury almost certainly concluded that Haddock intentionally violated the law, not that he believed in good faith that his actions were legal but that his belief was unreasonable. Haddock therefore has not met his burden of proving prejudice due to this alleged error.

liberally in that case. *Haddock*, No. 90–20075–01, slip op. at 20–21. Even if not liberally construed, the indictment clearly put Haddock on notice of the charges and enabled him to assert double jeopardy. *See Haddock*, 956 F.2d at 1542–43. Second, even if the trial court would have sustained a pretrial objection, we do not think there is a reasonable probability that the jury would have acquitted Haddock on count ten if "inviting reliance" had been removed. The indictment alleged that Haddock had altered or caused to be altered the First Finance checkbook, so the jury must have been convinced that Haddock had knowingly made or caused to be made the false statements in the checkbook. *See id.* at 1543.

Haddock argues that even if these individual errors were not prejudicial on their own, their cumulative effect was prejudicial. We disagree. We have already noted that the combined failure to investigate witness testimony and the admissibility of the five documents was not prejudicial. The other three alleged errors were entirely unrelated to the others and their cumulative effect is no greater than their individual effects. We do not consider the added effect of the other causes of prejudice cited by Haddock because he has not argued or demonstrated that they were errors themselves. *See United States v. Rivera*, 900 F.2d 1462, 1470–71 (10th Cir.1990) (explaining that court should consider only the cumulative effect of individual errors, not the added effect of non-errors).

## II. Sentencing

Only counts nine and ten are covered by the sentencing guidelines; the remainder occurred before the guidelines' effective date. The district court originally enhanced Haddock's sentence on counts nine and ten by considering Haddock's gain from all counts as a substitute for the loss enhancement provided by section 2F1.1 of the guidelines. On direct appeal, we upheld the district court's consideration of loss due to all the counts, but we vacated and remanded for consideration of any actual or intended loss rather than gain to the defendant. *Haddock*, 956 F.2d at 1554.

On remand, the district court again held that the loss was properly based on financial gain to Haddock. Haddock's gain was determined to be $328,523, the difference between the actual cost of the FDIC packages, $1,220,743, and the amount advanced by White City and Kaw Valley to buy them, $1,549,266. J.A. Vol. II at 633. This resulted in a seven-level enhancement of Haddock's sentence.

Haddock argues that the district court did not follow our directions on remand, and that in any event it was improper to use his gain as the measure of loss under section 2F1.1. Although we remanded for consideration of actual or intended loss, we did not say when the defendant's gain may be used as an alternative measure of loss. *See Haddock*, 956 F.2d at 1554. Therefore we must first decide when the district court has discretion to measure loss by the defendant's gain instead of the victims' loss.

■ Haddock argues that the defendant's gain can never be used to estimate loss, and also cites the Third Circuit's opinion that the defendant's gain can only be used when the true loss is not measurable. *See United States v. Kopp*, 951 F.2d 521, 530 (3d Cir. 1991). We disagree with both Haddock and the Third Circuit. Application note 8 clearly permits the court to estimate actual loss in any of several ways, including measuring the defendant's gain, regardless of whether the court could measure the actual loss with "an exact figure." U.S.S.G. § 2F1.1 n. 8 (1987); *see also United States v. Herndon*, 982 F.2d 1411, 1420 (10th Cir.1992) (explaining that district court has discretion to calculate loss in various possible ways).

■ Nevertheless, the enhancement is only for loss to victims, not for gain to defendants. The defendant's gain may be used only as an "alternative estimate" of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims. *See United States v. Smith*, 951 F.2d 1164, 1166–69 (10th Cir.1991) (holding that no loss enhancement was appropriate for seller who misrepresented buyers' down payments because none of the loans were in default); *United States v. Schneider*, 930

F.2d 555 (7th Cir.1991) (holding that no loss enhancement was appropriate where there was no actual or intended loss even though defendants would have profited from fraudulently obtained contracts); *United States v. Hughes,* 775 F.Supp. 348 (E.D.Cal.1991) (refusing to enhance sentence based on amount of fraudulent loans because there was no actual, probable, or intended loss). Furthermore, application note 8 makes the obvious point that whatever the court uses to estimate the loss, the estimate must be "reasonable." If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss. We therefore will consider first the actual and intended loss due to Haddock's fraud, then we will consider whether Haddock's gain is a reasonable estimate of the actual or intended loss.

## A. *Actual Loss*

The district court adopted the Presentence Investigation Report, J.A. Vol. I at 127–28, and the government had no objections to that report. *Id.* at 102; Presentence Investigation Report ¶ 103. The presentence report found that the total loss was $148,938.93. Presentence Investigation Report ¶ 33. This total consisted of $47,206.93 from losses on the Easton and Nortonville loans, $51,732 in lost income on the Nortonville loans that White City never received, and $50,000 that White City paid above the purchase price for the Galena loans. *Id.* ¶¶ 29, 31–32. The report also found that the full actual loss could not be determined because the Easton and Nortonville loans might lose more money in the future, and suggested using the defendant's gain instead. We must accept these factual findings unless clearly erroneous, but we review de novo what may be included in computing loss. *United States v. Levine,* 970 F.2d 681, 690 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992).

■■■■ Actual loss under section 2F1.1 is "the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost." *Kopp,* 951 F.2d at 531. A court should measure actual loss by "how much better off the victim would be but for the defendant's fraud." *Id.* This measure properly includes all types of losses but does not include those that are not attributable to the defendant's fraud. Furthermore, only net loss is considered; anything received from the defendant in return reduces the actual loss. *Smith,* 951 F.2d at 1167.

We now consider the actual net loss caused by each of Haddock's crimes.

*Counts Two, Four, and Seven.* Counts two, four, and seven all involved fraudulent misrepresentations in order to obtain loans from Kaw Valley to First Finance. In count two, Haddock made false statements on his personal financial statement that Kaw Valley examined in deciding to loan $711,000 to First Finance to buy the Easton loans. In count four, Haddock represented that the full $711,000 would be used to buy the Easton loans, yet he used $250,000 to refund White City's first down payment and $55,000 for his own use. In count seven, Haddock misrepresented to Kaw Valley that it would have a security interest in all of the Nortonville loans as collateral for a $94,000 loan, while twelve of the twenty-nine Nortonville loans already belonged to White City.

■■■■ Although subsequent amendments to the application notes have clarified this principle, we think it is clear even under the 1987 guidelines that the net loss to a lender is the unpaid amount of the loans minus the value of the collateral at the time of sentencing. *See id.* at 1167–68. Although fraudulently obtained, the loans could cause no actual loss if they were fully secured. *Id.* at 1168.

■■■■ The government has not proved how much remained to be paid on these loans, nor has it proved the value of the loans actually available as collateral. Apparently First Finance had made substantial payments on the loans and had not defaulted. *See* J.A. Vol. I at 117–18. The government therefore has not met its burden of proving actual loss from these three counts involving fraudulent acquisition of loans. *See id.* at 1167 & n. 5 (explaining that government has burden of proving loss under section 2F1.1 by preponderance of the evidence).

*Count Three.* Haddock repaid the $250,-000 down payment by White City that is the subject of count three. White City therefore did not lose anything because of this offense.

■ *Count Five.* Haddock's fraud in count five was promising White City exclusive purchase rights to the Easton loans in exchange for $350,000, even though Kaw Valley already had a security interest in the Easton loans. The presentence report included in the actual loss the amounts not collected on loans that defaulted. However, the losses on the purchased loans are not due to Haddock's fraud. White City would have owned the defaulting loans even if Haddock had done everything he promised to do. Haddock did not misrepresent the quality of the loans or give White City different loans than they thought they purchased; he only charged them more than he should have for the Galena loans, kept some of the Nortonville loans for himself, and fraudulently promised exclusive rights to purchase the Easton loans.[3] None of Haddock's crimes affected whether White City would lose money on the loans it agreed to buy.

Haddock argues that White City did not lose anything due to the conduct involved in this count, because it was able to buy any of the Easton loans it wanted despite Kaw Valley's security interest. Whenever White City wanted to buy a loan, First Finance would use White City's payment to pay down the Kaw Valley loan in the same amount. If so, White City received what it bargained for despite Haddock's fraud and did not lose anything. The government has not offered any contrary proof, either that White City did not receive value equivalent to its $350,-000, or that it was not able to buy any of the Easton loans it wanted to buy. The government therefore has not met its burden of proof that count five caused any actual loss.

*Count Six.* Haddock claims that White City did not lose anything due to his fraudulent delivery of only twelve of the twenty-nine Nortonville loans because the ten loans remaining after Haddock repurchased two were adequate collateral for White City's $181,000 and because the bank made money on the loans they received.

■ Haddock misses the point. White City was buying the Nortonville loans, not lending money to First Finance with the Nortonville loans as collateral. Nor would loss or profit on the loans that White City bought be due to Haddock's fraud. Haddock's crime was fraudulently keeping seventeen of the loans that White City bought. White City lost the value of those undelivered loans. The measure of loss for property taken is its fair market value. U.S.S.G. § 2B1.1 n. 2 (1987); *see also United States v. Johnson,* 941 F.2d 1102, 1114 (10th Cir.1991). However, the government has not offered any evidence of the loans' fair market value. The presentence report did find that the income on the loans that Haddock fraudulently retained was $51,732 through May, 1988. White City certainly lost that amount, although it is only part of its total loss due to Haddock's fraud in count six. Since that is all that the government proved and all that the district court found, the actual loss from count six is $51,732.

■ *Count Nine.* Count nine is based on Haddock's misrepresentation that the Galena package cost $95,766.45 rather than $70,-766.45. White City paid a total of $120,-766.45 for the Galena loans, $25,000 of which it agreed to pay as a servicing fee to First Finance.

Haddock suggests that because White City later proposed First Finance should "close out the account" by returning the extra $25,-000, there was no loss. We cannot tell from the record if First Finance actually did repay $25,000, and even Haddock does not say directly that it did repay the money. Appellant's Br. at 46. Therefore the district court's implied finding that Haddock did not

3. Because we find that defaults on the purchased loans are irrelevant to determining loss, the evidence on those defaults provided by White City's successor at the second sentencing hearing is irrelevant. That new evidence also explained that White City went out of business due to problems with the loans it bought, but the government has not made any attempt to quantify that loss nor did the district court rely on that loss. We therefore do not need to consider that evidence or decide whether enhancing a sentence on the basis of such evidence not previously before the trial court would violate the double jeopardy clause as Haddock asserts.

repay the excess $25,000 is not clearly erroneous.

Haddock also argues that the Due Process Clause forbids considering the loss due to the Galena transaction because it was the subject of count eight, which we reversed and the government dropped on remand. *See* J.A. Vol. I at 106–07. The district court considered count eight to be the equivalent of uncharged "relevant conduct" that may be considered under U.S.S.G. § 1B1.3. *Id.* We need not decide this question, however, because neither the calculation of Haddock's gain nor our calculation of loss relies on count eight at all. Count eight only involved the use of a $50,000 down payment for purposes other than buying the Galena loans. No loss is attributable to that offense because White City nevertheless eventually received the loans it paid for with that $50,000. The gain included by the district court was attributable to the offense in count nine: Haddock's overstatement of the price and collection of an extra $25,000 after the $50,000 down payment.

■ We therefore conclude that the excess $25,000 due to the misrepresented purchase price should be included in the actual loss due to Haddock's fraud. However, the agreed $25,000 servicing fee may not be included in the loss. *See United States v. Lara,* 956 F.2d 994, 998 (10th Cir.1992) (holding that difference in what contractor received with altered subcontractor bids and what contractor would have received without altered bids was proper measure of loss). Although the price was exaggerated, First Finance nevertheless did do all the servicing that it agreed to do in exchange for the $25,000 fee. White City would have paid that amount even if Haddock had not committed the fraud involved in this count.

*Count Ten.* Finally, count ten was based on Haddock's alteration of First Finance's checkbook. The government has not demonstrated any actual loss resulting from this act of fraud.

Based on the foregoing, we conclude that the government has proved actual loss of approximately $76,000.

**B. *Intended Loss***

■ Intended or probable loss may be used instead of actual loss "[w]here there is no [actual] loss, or where actual loss is less than the loss the defendant intended to inflict." *Smith,* 951 F.2d at 1166. Since there is actual loss in this case, the court may use intended or probable loss only if it is higher and can be determined.

■ *Counts Two, Four, and Seven.* On the Kaw Valley loan counts, the government has not proved that any loss on the loans to First Finance is "probable" in the future, nor has it proved by a preponderance of the evidence that Haddock intended Kaw Valley to lose any amount of money. In fact, the evidence suggests that Haddock did intend to repay the loans. The amount of the loans therefore is not an intended loss, unlike those cases where the defendant did not intend to repay and the lender recovered some of the money in spite of the defendant's intention. *See United States v. Johnson,* 908 F.2d 396, 398 (8th Cir.1990). The mere possibility that some of the loans may default in the future is not enough to establish probable loss. *See Smith,* 951 F.2d at 1169.

■ *Counts Three and Five.* The government also has not offered any evidence that Haddock intended to cause any loss to White City in counts three and five. Haddock repaid the first down payment, the subject of count three. Although Haddock fraudulently promised exclusive purchase rights to White City in count five, Haddock's actions nevertheless demonstrate that he intended to sell them any of the Easton loans that they wanted to buy, despite the Kaw Valley security interest. The government has not suggested any reason that loss would probably result from these counts, and it seems to us that no loss was probable if Haddock paid down the Kaw Valley loan as he collected money for purchases from White City. The only way he might have caused loss would have been if First Finance had defaulted on the Kaw Valley loan and Kaw Valley had kept the loans as collateral. But there is no evidence that First Finance defaulted.

■ *Count Six.* Haddock clearly intended to cause a loss to White City by keeping seventeen of the loans that White City was supposed to have bought. The intended loss was no greater than the actual loss, however. Again, the government has not even estimated the loans' market value, of which Haddock intended to deprive White City. The government has only quantified the $51,732 in income from the loans that Haddock intended to keep and did keep.

*Count Nine.* Even if Haddock intended to keep the extra $25,000 he received by misrepresenting the purchase price of the Galena package, this is equivalent to the actual loss, as well as the probable loss. The $25,000 servicing fee was no more an intended or probable loss than it was an actual loss.

*Count Ten.* Haddock obviously did not intend to cause any loss by altering the First Finance checkbook. He just hoped to avoid being caught.

We thus conclude that the intended or probable loss is no greater than the actual loss, and therefore should not be used instead of actual loss.

### C. *Gain to the Defendant*

■ We now consider whether Haddock's gain, as calculated by the district court, reasonably estimated the actual and intended loss.

The district court calculated Haddock's gain at $328,523. Of that amount, only the $50,000 due to the Galena transaction was actually profit to Haddock.[4] Half of that $50,000 was agreed profit and should not be used to estimate the loss due to Haddock's fraud. *See Lara,* 956 F.2d at 998. The remaining $278,523 is only excess borrowing from Kaw Valley beyond what Haddock needed to buy the loan packages. Kaw Valley may have been undersecured as a result, but the government has not attempted to quantify this risk. *See Schneider,* 930 F.2d at 559. There is no evidence that First Finance defaulted or otherwise caused Kaw Valley to lose money on the loans. Further-

---

4. However, the Probation Office's calculation left out Haddock's gain of seventeen of the Nortonville loans, because the Probation Office only

more, First Finance had made substantial payments on the loans. For all the evidence shows, Kaw Valley's undersecurity may have been reduced or eliminated altogether by the time the fraud was discovered or the sentence was imposed. Therefore the difference between the amounts borrowed and the purchase price of the loan packages does not reasonably estimate any loss to Haddock's victims.

The only gain to Haddock which reasonably estimates any actual or intended loss to his victims is the undisclosed profit on the Galena transaction and the value of the Nortonville loans wrongfully kept by Haddock. This is no different from the actual loss. The evidence shows an actual loss of approximately $76,000, which justifies a 5–level increase rather than a 7–level increase under the applicable 1987 guidelines. *See* U.S.S.G. § 2F1.1(b)(1) (1987). The total offense level is thus 17 rather than 19, and the proper sentencing range is 24 to 30 months rather than 30 to 37 months. *See id.* § 5A.

We AFFIRM the district court's denial of Haddock's petition on the ground of ineffective assistance, but we REMAND for resentencing consistent with this opinion.

---

considered the fact that Haddock paid $273,500 for the Nortonville loans and received only that same amount to pay for them.