111 F.3d 139
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
William WILLIAMS, Defendant-Appellant.
 No. 95-50530.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 8, 1997.
Decided April 15, 1997.
 
 1
 Before FLETCHER and TROTT, Circuit Judges, and JENKINS,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 William Williams, his wife, and a business associate engaged in a series of real estate loan and related financial transactions involving several lending institutions. On August 5, 1993, Williams was indicted for acts related to several of those transactions. On April 11, 1994, pursuant to a March 15, 1994 plea agreement, Williams entered guilty pleas to Counts One (conspiracy, 18 U.S.C. § 371), Two (making false statements to federally insured lending institutions, 18 U.S.C. § 1014), Three (same), Seven (bank fraud, 18 U.S.C. § 1344), Nine (aiding and abetting, 18 U.S.C. § 2), and Twelve (monetary transaction violations, 18 U.S.C. § 1957) of the thirteen-count Indictment.
 
 
 4
 On August 2 and October 23, 1995, the district court held extended sentencing hearings. After considering evidence and argument concerning the actual losses attributable to Williams' conduct, and computing an adjusted offense level of 20 and a criminal history category of I under the United States Sentencing Guidelines, the district court sentenced Williams to concurrent terms of imprisonment, namely 33 months (Counts One, Seven, Nine & Twelve) and 24 months (Counts Two & Three) respectively. In addition, Williams was sentenced to a term of three years of supervised release, and ordered to pay $2,575,918.20 in restitution.
 
 
 5
 Williams asserts that the district court erred in calculating the amount of loss caused by Williams' "relevant conduct" involving a $3,025,000 Santa Paula Savings loan on "Hidden Lakes Phase II," a condominium development project: he argues that the court misallocated the burden of proof and erroneously attributed $1,327,101 of the lender's prior losses on the Hidden Lakes development to Williams' conduct in the Phase II loan transaction. Williams also asserts that the district court erroneously found that he is capable of paying $2,575,918.20 in restitution and erroneously adjusted his offense level two points upward based upon his leadership role in the offense.
 
 
 6
 We have jurisdiction under 28 U.S.C. § 1291 (1994) and 18 U.S.C. § 3742 (1994). We affirm.
 
 
 7
 * The district court's findings of fact at sentencing are reviewed under the clearly erroneous standard. Such findings need only be supported by a preponderance of the evidence. United States v. Asagba, 77 F.3d 324, 325 (9th Cir.1996); United States v. Fuentes-Mendoza, 56 F.3d 1113, 1116 (9th Cir.), cert. denied, 116 S.Ct. 326 (1995); United States v. Harper, 42 F.3d 1387 (9th Cir.1994); 18 U.S.C. § 3742(e); see Concrete Pipe & Prod. of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 623 (1993) ("[R]eview under the clearly erroneous standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed' " before we reverse). The district court's application of the Sentencing Guidelines to the facts is reviewed for an abuse of discretion. The district court's interpretation of the Guidelines, as a question of law,
 
 
 8
 "is not entitled to deference, though '[l]ittle turns on whether we label review of this particular question abuse of discretion or de novo, for ... [a] district court by definition abuses its discretion when it makes an error of law.' " United States v. Willett, 90 F.3d 404, 406 (9th Cir.1996) (internal citation omitted) (alteration in original) (quoting Koon v. United States, --- U.S. ----, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996) (holding that a district court's departure from the Guidelines is reviewed for an abuse of discretion))....
 
 
 9
 United States v. Petersen, 98 F.3d 502, 505-06 (9th Cir.1996); see also 18 U.S.C. § 3742(e) (the "court of appeals shall give ... due deference to the district court's application of the guidelines to the facts"). The court of appeals reviews de novo whether the district court applied an improper measure of value in calculating "loss" under the guidelines. See, e.g., United States v. Kelly, 993 F.2d 702, 704 (9th Cir.1993).
 
 
 10
 We review de novo whether a defendant has waived his statutory right to appeal. United States v. Petty, 80 F.3d 1384, 1386 (9th Cir.1996); United States v. Haggard, 41 F.3d 1320, 1325 (9th Cir.1994) ("An express waiver of the right to appeal in a negotiated plea of guilty is valid if knowingly and voluntarily made." (internal quotations omitted)). If a defendant intentionally relinquishes and abandons a known legal right, the matter lies beyond the scope of appellate review. United States v. Olano, 507 U.S. 725, 732-33 (1993). If a defendant fails timely to assert a right, the waiver of that right is reviewed for plain error. Id. at 733-36.
 
 II
 A. Waiver of Appeal from Sentence
 
 11
 The Government contends that Williams has waived any right to appeal from his imposed sentence as set forth in his plea agreement, which reads in pertinent part:
 
 
 12
 11. As set forth above, you understand that a sentencing guideline range for your case will be determined by the Court in accordance with the Sentencing Reform Act of 1984.... You further understand that Title 18, United States Code, Section 3742 gives you the right to appeal the sentence imposed by the Court. Acknowledging all of this, you knowingly and voluntarily waive your right to appeal any sentence imposed by the Court and the manner in which the sentence is determined, so long as your sentence is within the applicable sentencing guideline range. By this agreement, you do not, however, waive your right to appeal an upward departure from the sentencing guideline range determined by the Court to apply to your case.
 
 
 13
 Based upon this language, the Government asserts that Williams "agreed that he could only appeal an upward departure from the applicable sentencing guideline range." The Government relies on United States v. DeSantiago-Martinez, 38 F.3d 394, 395 (9th Cir.1992), cert. denied, 115 S.Ct. 939 (1995), and United States v. Bolinger, 940 F.2d 478 (9th Cir.1991), as authority for the proposition that "an express waiver of the right to appeal in a negotiated plea of guilty is valid if knowingly and voluntarily made." Id. at 480. The Government submits that it "recommended, and the district court imposed, a sentence within the applicable guideline range," thus satisfying the terms of the plea agreement. Of course, the Government's position presupposes that the guideline range recommended and imposed is the correctly "applicable" one.
 
 
 14
 Paragraph 11 of Williams' plea agreement undertakes to waive Williams' right to appeal, but only "so long as [Williams'] sentence is within the applicable sentencing guideline range." The "applicable guideline range" had not been determined at the time Williams entered into his plea agreement.[1] Indeed, that question became the subject of extensive briefing and extended sentencing hearings.
 
 
 15
 Congress mandates that absent an upward or downward departure, "[t]he court shall impose a sentence of the kind, and within the range" set forth in the guidelines issued by the United States Sentencing Commission. 18 U.S.C. § 3553(b) (1994). This anticipates that the sentence will reflect the correct application of the guidelines. To assure sentencing accuracy, Congress expressly afforded a right to appeal where sentence "was imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(a)(2) (1994).
 
 
 16
 Section 3742 reflects Congress' view that "[a]ppellate review of sentences is essential to assure that the guidelines are applied properly and to provide case law development of the appropriate reasons for sentencing outside the guidelines." S.REP. NO. 225, 98th Cong., 2d Sess. 158 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3341. Particularly in the context of open-ended plea agreements such as this one, the Government's blanket waiver theory would drastically curtail the role of appellate review in assuring the correct and uniform application of the sentencing guidelines by the district courts and the avoidance of unwarranted sentence disparities among defendants with similar criminal histories and offense conduct.[2]
 
 
 17
 The Government's waiver theory would require that the court of appeals find that Williams "knowingly and voluntarily" waived any objection to what was then an open, undefined term of his plea agreement. This represents a broader reading of an appeal waiver than we adopted in Navarro-Botello, in which we noted that "a waiver of the right to appeal would not prevent an appeal where the sentence imposed is not in accordance with the negotiated agreement." United States v. Navarro-Botello, 912 F.2d 318, 321 (9th Cir.1990) (emphasis added), cert. denied, 503 U.S. 942 (1992).[3]
 
 
 18
 For Williams' sentence to be "in accordance with the negotiated agreement" in this case, at minimum he must have been sentenced within the correct "applicable guidelines range."[4] Indeed, Paragraph 10 of his plea agreement advises Williams that by pleading guilty, Williams is waiving a panoply of rights, "except the right to appeal an illegal sentence." (Emphasis added.) An "illegal sentence" comprehends a sentence imposed through an incorrect application of the guidelines. See 18 U.S.C. § 3742(a)(2) (1994). Appellate review of the district court's range determination assures that Williams' sentence was actually imposed within the "applicable guideline range," whatever it may be.
 
 
 19
 We conclude that Paragraph 11 of Williams' plea agreement did not operate as a waiver of his right to appeal from a sentence which imposes a period of custody outside the "applicable guideline range" as that range may be determined through the correct application of the federal sentencing guidelines. Williams may test the accuracy of the sentencing court's range determination on appeal.
 
 
 20
 B. Computation of the Loss Resulting from Williams' Offense Conduct ( § 2F1.1)
 
 
 21
 Under the sentencing guidelines, the amount of loss resulting from an offense involving fraud is to be considered in determining the proper offense level. The offense level is adjusted upward depending on the actual or intended loss occasioned by the offender. United States Sentencing Commission, Guidelines Manual § 2F1.1 (Nov. 1995) [hereinafter U.S.S.G.]. Consistent with our prior cases, "actual loss" under the guidelines should be measured as the "net loss" flowing from the defendant's conduct. See, e.g., United States v. Hutchison, 22 F.3d 846, 855 (9th Cir.1993) ("actual loss" where defendant fraudulently obtained bank loan would refer to "the amount of the loan, minus the value of the collateral pledged") (citation omitted); United States v. Galliano, 977 F.2d 1350, 1352 (9th Cir.1992) (discussing "actual loss" in a context which suggests that court was referring to "net loss"), cert. denied, 507 U.S. 966 (1993); United States v. Niven, 952 F.2d 289, 291 (9th Cir.1991) (per curiam) (holding that district court's calculation of actual loss which was based on net loss was not clearly erroneous).[5] Under § 2F1.1 of the guidelines " 'the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.' " Niven, 952 F.2d at 291 (quoting § 2F1.1, comment. (n. 8)).
 
 1. Allocation of Burden of Proof
 
 22
 Pointing to extemporaneous statements by the district court at the sentencing hearing, Williams asserts that the district court erroneously assigned the defendant the burden of proving the amount of actual loss resulting from his conduct.[6] Considered in context, and in light of the whole record, the district court understood that the Government bears the burden of proof as to actual loss and had concluded that "the Government has produced convincing evidence [that] certainly meets the preponderance of the evidence standard," particularly as to the amount of loss now at issue on appeal. If anything, the remarks cited by Williams indicate merely that the defense had the burden of arguing its own objections to the recommendations found in the presentence report.
 
 2. Calculation of Actual Loss
 
 23
 A condominium development project known as Hidden Lakes contemplated construction of 150 units to be completed in eight phases. Concerning the two condominium development loans at issue on this appeal (known as the Hidden Lakes Phase I and Phase II loans), the district court found an actual loss to the construction lender resulting from Williams' conduct of $1,327,101.
 
 
 24
 Phase I of Hidden Lakes involved construction of forty-two condominium units. Williams submits that before he became involved in completing construction of Phase I of Hidden Lakes, the construction lender, Santa Paula Savings, had already booked a loss on the project between $1,909,576.15 and $2,104,133, with twenty-four of the forty-two projected units still unbuilt or only partially completed. On May 28, 1987, Santa Paula Savings loaned Williams $3,200,000 and conveyed to him the twenty-four unfinished Phase I units and 7.07 acres of real property surrounding them. The next day, Santa Paula Savings booked a $1,909,515.78 debit against the loan proceeds in favor of itself--repaying itself, according to Williams, for its prior loss on the Phase I project. This left $1,290,484.22 in loan proceeds available for construction disbursements on Phase I. Williams completed construction of the remaining Phase I units, expending the balance of the loan proceeds and contributing an additional $145,865 of his own funds, and had sold eleven of the twenty-four units for $747,319 at the time he entered into a similar loan for completion of Phase II of the project.
 
 
 25
 On April 21, 1988, Santa Paula Savings loaned Williams $3,025,000 to complete construction of twenty units of Phase II of Hidden Lakes, retaining $1,472,650 which it booked as "Principal Reduction to Loan # 01-12-019116," the Phase I loan.[7] Of the remaining $1,552,350, Williams drew a total of $1,277,953.90 to pay construction expenses on Phase II; Santa Paula credited the remainder ($274,396.10) to itself when it terminated its agreement with Williams in March of 1989.
 
 
 26
 The district court found that Santa Paula Savings was required to invest additional monies to complete the construction of the Phase II units, and that the "book value" of Phase II after completion of construction, including acquisition and construction costs, totaled $2,376,772. When the Resolution Trust Corporation ultimately liquidated Phase II of Hidden Lakes, it realized $1,049,671 in net sales proceeds in favor of then-defunct Santa Paula Savings.
 
 
 27
 For purposes of § 2F1.1(b) of the guidelines, the district court calculated the actual loss on the Hidden Lakes Phase II loan as follows:
 
 
 28
 $2,376,772 Total book value of Phase II project (after completion of all
 
 
 29
 units)
 
 
 30
 - 1,049,671 Net sales proceeds of RTC liquidation of Phase II units
 
 
 
 $1,327,101 Actual loss on Phase II loan
 Based upon the $1,327,101 Hidden Lakes Phase II loss, together with an additional actual losses of $1,264,968 on other loan transactions,[8] the district court concluded that the actual loss resulting from Williams' conduct, i.e., "how much better off the victim would be but for the defendant's fraud," (United States v. Haddock, 12 F.3d 950, 961 (10th Cir.1993)), was an amount greater than $2,500,000 and less than $5,000,000, calling for an offense level adjustment of thirteen levels pursuant to § 2F1.1(b)(1)(N) of the guidelines.
 Williams objects to the district court's computation of actual loss. As noted above, Williams asserts that Santa Paula Savings had incurred a loss on the Hidden Lakes projects of nearly $2,000,000 before Williams ever became involved. The $1,327,101 amount, computed by subtracting the Hidden Lakes net sale proceeds from the project's "book value," represents nothing more than a pass-through of a portion of Santa Paula's pre-existing losses reflected in the book value. "Therefore," for purposes of the federal sentencing guidelines, "the amount of loss in relation to the Santa Paula transaction was zero."
 Williams' objection goes to causation, not computation. He contends that he did not cause Santa Paula's losses on the Hidden Lakes condominiums; if anything, Williams contends he reduced Santa Paula's net loss on the project.
 
 
 [3]
 "Applicable Guideline Range" Based on Actual Loss
 Assuming that Williams is correct in asserting that Santa Paula Savings incurred no net loss resulting from the totality of Williams' conduct relating to the Phase I and Phase II loans, then based upon the undisputed actual loss of $1,264,968 on Williams' other loan transactions, the upward adjustment of his offense level under § 2F1.1(b)(1)(L) of the guidelines would be 11 levels, rather than the 13 levels used by the district court. If all other factors remain the same, the "applicable guideline range" for an adjusted offense level of 18 under Criminal History Category I would be 27-33 months instead of the 33-41 months for an adjusted offense level of 20 used by the district court. See U.S.S.G. Ch. 5, Pt. A.
 Williams was sentenced by the district court to a term of 33 months--a sentence that falls within the applicable guideline range for an adjusted offense level of 18. Thus, even if Williams is correct that no actual loss may be attributed to his Santa Paula loans, his sentence still falls within the "applicable guideline range."
 The district court's alleged error proves to be harmless.
 C. Adjustment Based upon Williams' Role in the Offense Conduct ( § 3B1.1(c))
 To be eligible for a two-level upward adjustment of his offense level under § 3B1.1(c) of the guidelines, Williams " 'must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.' " United States v. Hoac, 990 F.2d 1099, 1110 (9th Cir.1993) (quoting United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990) (internal quotations omitted)), cert. denied, 510 U.S. 1120 (1994). Williams now asserts that his wife and business associate "were all equal participants" over whom he exercised no "compelling force or discretion." In light of the facts in the record, however, the district court's finding that Williams had "directed the actions" of his codefendants in preparing and submitting false returns and applications to lenders was not clearly erroneous and was supported by a preponderance of the evidence, and for that reason is affirmed. See United States v. Asagba, 77 F.3d 324, 325 (9th Cir.1996).
 D. Waiver of Appeal from Restitution Order
 The Government also asserts that Williams waived his right to appeal from the order of restitution entered by the district court pursuant to 18 U.S.C. § 3663 and U.S.S.G. § 5E1.1.
 
 
 [1]
 Waiver in the Plea Agreement
 The Government points once more to the language of Paragraph 11 of Williams' plea agreement, in which he "knowingly and voluntarily" waives his right "to appeal any sentence imposed by the Court and the manner in which the sentence is determined, so long as [his] sentence is within the applicable sentencing guideline range." (Emphasis added.) According to the Government, the parties specifically contemplated that defendant's sentence would include an order of restitution and such an order was thereby encompassed within the Paragraph 11 waiver.[9]
 We recently rejected this reading of a similar plea agreement in United States v. Zink, --- F.3d ----, 1997 WL 66511 (9th Cir. Feb. 19, 1997). We reject it in this case for essentially the same reasons. In Williams' plea agreement, the subject of a restitution order is addressed in Paragraph 4:
 
 
 [4]
 By signing this agreement, you also agree that the Court can order you to pay restitution for the full loss caused by your activities. You agree that the restitution order is not restricted to the amounts alleged in the counts to which you are pleading guilty. You understand that any restitution order imposed by the Court is non-dischargeable in a bankruptcy proceeding, pursuant to 11 U.S.C. § 1328(a)(3)
 In contrast, Paragraph 3 of the agreement speaks of Williams' possible "sentence" in these terms:
 [T]he maximum sentence that the court can impose on all counts to which you are pleading guilty is 135 years incarceration, a five-year period of supervised release, a fine of $4,500,000 and a special assessment of $300 pursuant to 18 U.S.C. § 3013. The Court can also order you to pay the costs of your imprisonment.
 No reference to "restitution" is to be found in this all-inclusive description of "sentence." The "sentence" and the "restitution order" are not the same thing.
 We conclude that Williams waived only his right to appeal his sentence imposed under the guidelines where that sentence was imposed within the "applicable guideline range."
 
 
 [2]
 Failure to Object at the Time of Sentencing
 The Government asserts that Williams independently waived his right to appeal from the restitution order because he did not object to the amount of the order in the first instance before the district court. See United States v. Flores-Payon, 942 F.2d 556, 558-60 (9th Cir.1991). While Williams' counsel reviewed the terms of the restitution order with the district court at the sentencing hearing, argued the calculation of the loss amounts included in the order, and discussed to whom restitution would be paid, counsel made no objection at the sentencing hearing to the district court's imposition of its restitution order based upon Williams' inability to pay.
 As we pointed out recently in Zink, if a defendant fails timely to assert an objection to imposition of a restitution order, we review only for plain error. Zink, 1997 WL 66511, at * 1 (citing United States v. Olano, 507 U.S. 725 (1993)); see also United States v. Osborn, 58 F.3d 387, 389 (8th Cir.1995) (restitution order affirmed where district court considered proper factors and defendant "made no objection at sentencing to the imposition of a restitution order").
 E. Restitution of $2,575,918.20 in Light of Evidence Concerning Williams' Ability to Pay
 In issuing an order of restitution, a district court must consider (1) the amount of loss sustained by the victim, (2) the financial resources of the defendant, and (3) the financial needs and earnings of the defendant and the defendant's dependents. 18 U.S.C. § 3664(a) (1994). Although the district court is not required to make findings of fact regarding the defendant's financial condition, (United States v. Cannizzaro, 871 F.2d 809, 810-11 (9th Cir.), cert. denied, 493 U.S. 895 (1989)), the record must reflect that the district court had at its disposal information relating to the defendant's financial position. Id. at 811.
 Williams does not now dispute the district court's computation of the amount of restitution based upon actual losses flowing from Williams' conduct. Rather, Williams takes issue with the district court's finding that Williams has the future ability to pay $2.5 million in restitution, asserting that "there is absolutely no evidence ... whatsoever" demonstrating that ability. Williams' income figures as set forth in the presentence report reflect a negative net worth of ($381,870) and a negative cash flow of ($764) per month.
 As we explained most recently in Zink, a defendant's immediate indigence is not sufficient to preclude a restitution order. Zink, 1997 WL 66511, at * 4. The record of Williams' sentencing reflects both the availability of relevant information and the fact that the district court judge gave it some thought. In the present case, the presentence report contained information relating to Williams' financial condition and reflected the probation officer's evaluation that "[b]ased upon the defendant's resourcefulness and business acumen, it is believed that an order of restitution could be satisfied." The district court expressly found that Williams "has an extensive employment history as a real estate broker, a general contractor, a real estate developer, and a civil engineer" and that he "has been self-employed as a real estate developer and general contractor for the past 20 years, earning an average of approximately $50,000 per year." Based upon the information available, the district court concluded that Williams "has the future ability to earn income and pay a substantial restitution order." We cannot say that in light of the district court's findings concerning Williams' ability to pay, the restitution order amounts to plain error.
 The sentence and the restitution order imposed upon appellant by the district court are both AFFIRMED.
 
 
 *
 Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Unlike the plea agreement in Bolinger, Williams' plea agreement contained no 36-month sentencing "cap." 940 F.2d at 479. DeSantiago-Martinez, also cited by the Government, involved a similar sentencing cap: defendant waived his appeal "if the sentencing court does not impose a period greater than recommended by the Government." 38 F.3d at 397. Nor did Williams' plea agreement specify a guideline range as did the plea agreement in United States v. Navarro-Botello, 912 F.2d 318, 320 (9th Cir.1990) ("The range calculated by the parties in the plea agreement was 15-21 months"), cert. denied, 503 U.S. 942 (1992)
 
 
 [2]
 In his detailed examination of appeal waivers in plea agreements, Professor Robert Calhoun cautions against permitting the waiver of prospective sentencing error that could not be anticipated--sentencing error "the contours of which are unknown (and unknowable) at the time of the waiver." Such a waiver "is at odds with our most basic perceptions of why we have an appellate review process." Robert K. Calhoun, Waiver of the Right to Appeal, 23 Hastings Const.L.Q. 127, 200, 206 (1995). Appellate review allows for correction of aberrant, illegal or biased sentencing determinations and furthers the purposes of legislative sentencing reform by promoting uniformity and fairness within the system as a whole. Id. at 200-211
 
 
 [3]
 Suppose the district court through simple mathematical error had calculated an adjusted offense level of 26 instead of 20; did Williams "knowingly and voluntarily" waive any objection to a palpably erroneous "applicable guideline range" of 63-78 months? This proposition seems doubtful at best
 In Navarro-Botello, we concluded that when entering into a plea agreement, uncertainty as to the exact sentence the court will impose did not render the defendant's appeal waiver uninformed and therefore invalid. In that case, however, the plea agreement specified an agreed sentencing guideline range of 15-21 months and Navarro-Botello was sentenced within that range (21 months). 912 F.2d at 320. More recent case authority suggests another ground for the result in that case: the district court's exercise of discretion in imposing a sentence anywhere within the applicable range is not appealable. See Williams v. United States, 503 U.S. 193, 204-05 (1992); United States v. Reed, 914 F.2d 1288, 1290 (9th Cir.1990).
 
 
 [4]
 If his appeal waiver puts the "applicable guideline range" beyond appellate scrutiny, then as a practical matter, any guideline range would suffice. Yet error in calculation resulting in an incorrect upward offense level adjustment would represent an "upward departure" from the correct "applicable guidelines range"--from which, the Government concedes, Williams expressly did not waive his right to appeal
 
 
 [5]
 See also United States v. Harper, 32 F.3d 1387, 1391 (9th Cir.1994) (citing with apparent approval the Tenth Circuit's decision in United States v. Haddock, 12 F.3d 950, 961 (10th Cir.1993), in which that court stated that in calculating actual loss "only net loss is considered" and "anything received from the defendant in return reduces the actual loss"); United States v. Mount, 966 F.2d 262 (7th Cir.1992); United States v. Smith, 951 F.2d 1164 (10th Cir.1991); U.S.S.G. § 2F1.1 comment. (n. 7)
 
 
 [6]
 The Government bears the burden of proving by a preponderance of the evidence the amount of loss caused by the defendant's fraud. See United States v. Howard, 894 F.2d 1085, 1090 (9th Cir.1990) (government has burden of establishing facts needed to calculate base offense level)
 
 
 [7]
 According to Williams, $1,472,650 represented the difference between the "release value" of the thirteen unsold Phase I units, i.e., the amount Santa Paula would insist on receiving from sale proceeds before it would agree to release its trust deed on the properties, and the outstanding balance of the $3,200,000 Phase I loan. In December of 1988, Santa Paula "repurchased" the thirteen units from Williams as satisfaction of the remaining balance on the Phase I loan
 No amount of actual loss was specifically attributed to the Phase I loan by the district court.
 
 
 [8]
 Williams did not appeal from the district court's calculations of actual losses on other loan transactions
 
 
 [9]
 The Government attempts to distinguish United States v. Catherine, 55 F.3d 1462 (9th Cir.1995), which held that a defendant's waiver of his right to appeal from a sentence of incarceration did not extend to his right to appeal from an order of restitution; in Catherine, "the defendant waived his right to appeal from that sentence." Id. at 1464 (emphasis in opinion), ostensibly referring only to the sentence of incarceration. "In contrast," the Government asserts, "in this case, the plea agreement provides that defendant waived his right to appeal 'any sentence imposed by the [district court],' as well as the manner in which that sentence was determined. Because the plea agreement contemplated a restitution order, "the reference to 'any sentence' must be read to include the restitution order imposed."