UNITED STATES of America,
Plaintiff–Appellee,

v.

Sammy Claude WEST, a/k/a Ted,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry J. WRIGHT, Defendant–Appellant.

Nos. 92–5450, 92–5451.

United States Court of Appeals,
Fourth Circuit.

Argued May 3, 1993.

Decided Aug. 19, 1993.

Atiq Ahmed, Silver Spring, MD, argued, for appellant Wright.

Peter Dennis Ward, Bernstein, Sakellaris & Ward, Baltimore, MD, argued, for appellant West.

Susan Moss Ringler, Asst. U.S. Atty., Baltimore, MD, argued (Richard D. Bennett, U.S. Atty., Stuart A. Berman, Asst. U.S. Atty., on brief), for appellee.

Before PHILLIPS and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

PHILLIPS, Circuit Judge:

Larry J. Wright and Sammy Claude West appeal their convictions and sentences following a jury trial on an eight-count indictment charging them with conspiracy and with making false statements to the government in violation of 18 U.S.C.A. §§ 2, 371, and 1001 (1976 & Supp.1993). We affirm.

### I

Federal regulations require that contractors of federal construction projects secure bonds guaranteeing their performance of certain obligations. 48 C.F.R. Ch. 1, § 28.102 (1992). Until the regulations were amended effective February 1990, contractors electing to use individual instead of corporate sureties had to obtain two individual sureties to secure each contract. *Id.* § 28.202–2(a) (1988) (recodified as amended at *id.* § 28.203–1(b) (1992)). The regulations have consistently required a party wishing to qualify as an individual surety to file a Standard Form 28, Affidavit of Individual Surety (SF28), listing net worth, assets, and liabilities. Each SF28 must be accompanied by a Certificate of Sufficiency executed by, for example, a bank or government official acquainted with the surety candidate and with his or her financial status. *Id.* § 28.203–1(b) (1992).

Through their corporations, United Financial Investments and United Funding and

Investors (collectively, "UF & I"), Wright and West served as matchmakers between contractors and individual sureties. The typical fee for providing the bonds was 3–5% of the contract price. The charges for which Wright and West were convicted stemmed from their filing of false SF28s between 1986 and 1988.

These charges followed a prior indictment filed against Wright alone, which was dismissed in 1988 for procedural irregularity. Anticipating re-indictment in Maryland—as well as indictments in other districts—Wright entered a plea agreement with the U.S. Attorney for the District of Maryland. The agreement required that he plead guilty to an information charging him solely with making false statements in violation of 18 U.S.C.A. § 1001. He also agreed to cooperate with the ongoing investigation of UF & I, West, and others involved in the scheme. In exchange, the government agreed to notify Wright should it learn of any similar charges pending in other districts, and to try to have such charges dismissed.[1] The agreement also provided that if Wright failed to fulfill his prescribed obligations, any information obtained through his cooperation could be used against him in subsequent prosecutions.

Wright cooperated with the Maryland investigation, but as investigations arose in other districts, argued that his plea agreement provided him with global protection. The U.S. Attorney General's office rejected that interpretation. As the statute of limitations approached on the § 1001 charge, the government repeatedly requested that Wright indicate his readiness to enter his plea. When he failed to do so, the govern-

ment notified him that it considered the agreement "null and void." J.A. 22.

When the instant indictment was issued, Wright pleaded not guilty. He then moved the court to enforce the plea agreement by accepting his plea of guilty to a single § 1001 charge and by dismissing all other charges against him. Wright also moved under Fed. R.Crim.P. 11(e)(6) to suppress any statements that he had made while cooperating with the government's investigation.

At a hearing on the motions, Wright argued that his delay in filing his guilty plea under the agreement was justified by ambiguity as to the agreement's scope. He further argued that the court was obliged to enforce the agreement because, relying upon it, he had incriminated himself while cooperating with the government's investigation. The court rejected these contentions. It interpreted Wright's delays as tactical maneuvers intended to buy both time and broader protection against additional pending actions. Finding that Wright had unjustifiably breached the agreement, the court denied the motions. J.A. 83–84.

Following a two-week trial and entry of the jury verdicts against Wright and West, the court accepted the recommendations of presentence reports calculated under the U.S. Sentencing Guidelines provision in effect at the time of the offense conduct.[2] U.S. Sentencing Commission, *Guidelines Manual* § 2F1.1 (1988). On evidence that the conduct caused a loss of $2.9 million, the court made a ten-level upward adjustment in the base offense level of six. U.S.S.G. § 2F1.1(b)(1)(K). The court then imposed upon each defendant a 51–month sentence for each charge, with all sentences to run

1. Paragraph 4(e) provided that other than the § 1001 charge to which Mr. Wright has agreed to plead guilty, he will not be charged with any other violations of federal criminal law in this District concerning his activities as an individual surety, a surety bond broker, or the business of U.F. & I..... Furthermore, this Office has, at Mr. Wright's request, communicated with the United States Attorney's Offices in Dallas, Texas; Memphis, Tennessee; Jacksonville, Florida; Alexandria, Virginia; and the District of Columbia. None of these offices has an investigation pending against Mr. Wright or U.F. & I., nor is any presently contemplated. If any of these offices should at

any time undertake a prosecution of Mr. Wright or U.F. & I. in connection with any of the matters covered by this agreement, this Office will bring Mr. Wright's cooperation to its attention and shall make every effort to have the charges dismissed.
J.A. 6–7.

2. The court found the Guidelines applicable solely to the conspiracy conviction because the substantive offenses occurred before November 1, 1987. J.A. 381–82 (*citing United States v. Watford*, 894 F.2d 665, 670–71 (4th Cir.1990)).

concurrently. These consolidated appeals followed, challenging the judgments with respect to both the convictions and the sentences. We address the issues in that order.

## II

Wright first charges error in the court's denial of his motions to enforce his plea agreement and to suppress statements made while cooperating—as required by that agreement—with the government's investigation. He then joins West in contending that the court erred in admitting certain tax records into evidence and in giving inadequate instructions to the jury. We first consider the issues arising from the plea agreement.

### A

■ To the extent that Wright's entitlement to enforcement of the plea agreement turns on contract principles concerning the interpretation of unambiguous agreements or other matters of law, we review the district court's decision *de novo. United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986). To the extent that the court's decision turns on factual underpinnings for its finding of breach, we review for clear error. *United States v. Conner,* 930 F.2d 1073, 1076–77 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 420, 116 L.Ed.2d 440 (1991).

■ Wright concedes that a "plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984) (footnote omitted). He urges, however, that a constitutional predicate for enforcing the agreement arose when, through the exchange of promises and his own partial performance, the government induced him to make self-incriminating statements. In support of this argument, he relies primarily upon *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled.").

This raises the question whether *Mabry* left open the possibility that performance on a cooperation clause in a plea agreement—an agreement which although memorialized and accepted by both parties, is not fully executed by judgment upon a guilty plea—could implicate a defendant's Fifth Amendment right to be free from self-incrimination sufficiently to warrant enforcement of the agreement.[3] We need not reach that question, however, for, even assuming such a right, we agree with the district court that Wright breached the agreement, thereby forfeiting any right to its enforcement, through his unjustifiable failure to respond to the government's repeated requests for his plea.[4] Such

---

**3.** *See Fields v. Attorney Gen. of Maryland,* 956 F.2d 1290, 1300 (4th Cir.) (noting in dictum that "[s]pecific performance of the *arraignment plea offers* would be available only if Fields had accepted a valid plea agreement or detrimentally relied on a valid plea agreement that was subsequently withdrawn", but finding no evidence of acceptance or detrimental reliance) (citations omitted, emphasis added), *cert. denied,* — U.S. —, 113 S.Ct. 243, 121 L.Ed.2d 176 (1992); *United States v. Gonzalez,* 918 F.2d 1129, 1134 n. 2 (3d Cir.1990) ("*Santobello* arguably could be extended to cover the situation where the defendant has not yet entered the plea, but has relied on the bargain in such a way that a fair trial would no longer be possible.") (internal quotation marks and citation omitted), *cert. denied,* — U.S. —, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991); *see also Plaster v. United States,* 789 F.2d 289, 294–95 (4th Cir.1986) (Wilkinson, J., concurring) (detrimental reliance through self-in-

crimination requires government to abide by terms of immunity agreement); Graham Hughes, *Agreements for Cooperation in Criminal Cases,* 45 Vand.L.Rev. 1, 53–56 (1992). *But see United States v. Coon,* 805 F.2d 822, 825 (8th Cir.1986) ("[t]he only change in position that can be considered 'detrimental reliance' is the actual entry of an involuntary guilty plea"; self-incrimination may be cured at trial by exclusion of statements as involuntary).

**4.** The district court properly rejected Wright's attempt to defend against the allegation of breach by suggesting that ¶ 4(e) of the agreement rendered its scope ambiguous. *See supra* n. 1. Although it is the rule in this circuit that plea agreements bind "the Government at large—not just specific United States Attorneys or United States 'Districts'," *Harvey,* 791 F.2d at 303 (emphasis in original), ¶ 4(e) indicates the clear intention-also contemplated by *Harvey*—that the

a breach relieves the government of its obligation to conform to the agreement's terms even when defendant has relied to his substantial detriment by, for example, entering his guilty plea, subjecting himself to conviction, and beginning service of the sentence. *Ricketts v. Adamson,* 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); *see also United States v. Tilley,* 964 F.2d 66, 70 (1st Cir. 1992).[5]

■ Similarly, we find no abuse of discretion in the court's denial of Wright's motion to suppress statements made during two interviews undertaken in cooperation with the government's investigation of the surety scheme. Fed.R.Crim.P. 11(e)(6) prohibits admission of any statement resulting from plea discussions that "do not result in a plea of guilty." The terms of the plea agreement, however, clearly contemplated use of Wright's statements in the event of his breach. J.A. 7. Thus, the breach "justly exposed him to prosecutorial use" of any information provided in partial compliance with the agreement. *United States v. Stirling,* 571 F.2d 708, 732 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Moreover, Wright cites nothing in the record to indicate that any such statements were actually admitted into evidence; showing no prejudice, his argument for reversal must fail. *Cf. United States v. Thomas,* 774 F.2d 807, 809 (7th Cir.1985) *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1218, 89 L.Ed.2d 329 (1986).

**B**

■ Wright and West next contend that the court abused its discretion in admitting into evidence, over their objections, Wright's federal tax returns along with IRS certifications that neither West nor UF & I had filed any tax returns between 1985 and 1990. *See United States v. Greenwood,* 796 F.2d 49, 53 (4th Cir.1986). The contention is that the

evidence constituted "bad acts" evidence impermissible under Fed.R.Evid. 404(b), and was more prejudicial than probative. We disagree.

"The threshold inquiry a court must make before admitting similar acts evidence under 404(b) is whether the evidence is probative of a material issue other than character." *Huddleston v. United States,* 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The district court instructed the jury that the trial involved no charges of tax evasion, and that the tax evidence was to be considered as relevant only to the issue of intent to defraud. J.A. 237–38. Because Wright's tax records were direct proof of the falsity of the net worth statements on his SF28s, they fell easily within the scope of admissible 404(b) evidence. UF & I's failure to file was also probative on the question whether Wright and West ever intended the corporation to be anything other than a sham.

West's failure to file is less clearly probative of his intent, and it is with respect to that evidence alone that the possibility of unfair prejudice arises. We find, however, that the court's limiting instruction was amply curative. *Greenwood,* 796 F.2d at 53.

■ Finally, Wright and West urge that the district court erred in denying their request for jury instructions on the defense of good-faith reliance on the advice of professionals (here, attorneys and accountants). The court reasoned that because Wright and West failed to offer evidence to support a finding of the essential elements of the defense, the instruction was unwarranted. Reviewing that reasoning and the evidentiary record *de novo,* we find no error. *United States v. Schmidt,* 935 F.2d 1440, 1449 (4th Cir.1991).

---

obligation at issue here was to be "limited territorially." *Id.*

**5.** We reject as meritless Wright's contention that the government breached ¶ 6 of the agreement by declaring it "null and void" before any adjudication of his own alleged breach occurred. Paragraph 6 was satisfied when, after the hearing on

Wright's motion to enforce, the district court found by a preponderance of the evidence that he had breached the agreement, motivated not by genuine uncertainty over its scope, but by a desire to "dilly-dally" and shake out a better deal. J.A. 83.

## III

■ Wright and West also challenge the court's application of U.S.S.G. § 2F1.1(b)(1), which provides for incremental sentence enhancement based on amount of loss caused by fraudulent conduct. Although we review the court's interpretation of the Guidelines *de novo*, to the extent that the determination of the amount of loss is a factual matter, we review only for clear error. *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989).

The district court correctly relied upon clarifying amendments to § 2F1.1, enacted after the conspiracy occurred,[6] that now define "loss" as "the value of property taken, damaged, or destroyed." U.S.S.G. § 2F1.1 comm. app. n. 7 (cross-referencing § 2B1.1, comm. app. n. 2) (1991); *see also* § 2F1.1, comm. app. n. 7 (1992) ("loss is the value of the money ... unlawfully taken"). The government presented evidence that it had paid out $2.9 million in brokerage fees to Wright, West, and UF & I for bonds secured through falsified SF28s, along with evidence of the face value of the contracts fraudulently undersecured—a value which exceeded the fee amount by tens of millions of dollars. J.A. 47–49.

The court carefully considered whether the fee amount was dispositive as to the government's loss. Relying on application note 7 to § 2F1.1(b)(1), the court reasoned that

> though there were defaults in only a few of the contracts [fraudulently] bonded, the Government paid for fraudulent bonds in all of them. Thus, ... while it is true that actual loss in the sense of belly-up contracts was well below $2,000,000, the true governing consideration is that such an actual loss approach in this case would "tend not to reflect adequately the risk of loss created by the defendant's conduct," especially considering the fact that many of these affidavits were, according to the credible evidence at trial, submitted in support of far more dollar volume in contracts

than the sureties' alleged assets—let alone their real assets—would have justified. J.A. 382 (presentence letter to counsel). At the sentencing hearing, the court reiterated that reasoning as its basis for setting the loss at $2.9 million, relying additionally on application note 8 ("The offender's gain from committing the fraud is an alternative estimate that usually will underestimate the loss."). J.A. 359–62.

Wright and West contend that the government failed to prove either actual loss or risk of loss because it did not eliminate the possibility that, with respect to each of the fraudulently secured bonds, one of the two sureties might have had sufficient assets to cover a forfeiture. They urge that, when adequate sureties are factored into the equation, the risk of loss shrinks from $2.9 million to $429,-154—and the permissible offense-level enhancement from ten to seven.

We disagree. As the district court noted, at the time Wright and West engaged in their enterprise two individual sureties were required to secure a bond, each with a net worth equal to or exceeding the contract price. 48 C.F.R. 28.202–2 (1988). Thus, the court properly concluded that the government simply did not get what it paid for so that the amount paid out (or "the money ... unlawfully taken") fairly constitutes actual loss under § 2F1.1. *Accord United States v. Wilson*, 993 F.2d 214, 218 (11th Cir.1993) (actual loss set at amount of brokerage fees collected in loan-brokering conspiracy). Nor do we find clear error in the district court's conclusion, after a careful evaluation of the evidence before it, that the $2.9 million figure accurately represents "the risk of loss created by defendant[s]' conduct." U.S.S.G. § 2F1.1(b), comm. app. n. 7(b) (1992). Consequently, the decision of the district court is

*AFFIRMED.*

---

**6.** *See Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (Guidelines commentary binding unless inconsistent with Constitution, federal statute, or Guidelines themselves; reserving question of retroactive application); *United States v. Marin,* 916 F.2d 1536, 1538 & n. 4 (11th Cir.1990) (per curiam) (post-offense amendments applicable unless they increase offense levels available under earlier version of Guidelines).