**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 96-4632

LINDA JAMES BARNES,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 96-4643

CHARLES PHILLIP JAMES,
Defendant-Appellant.

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., District Judge.
(CR-95-194)

Submitted: May 30, 1997

Decided: June 19, 1997

Before HALL, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Thomas N. Cochran, Assistant Federal Public Defender, Greensboro,
North Carolina; Michael W. Patrick, HAYWOOD, DENNY & MIL-

LER, L.L.P., Durham, North Carolina, for Appellants. Walter C. Holton, Jr., United States Attorney, Scott P. Mebane, Assistant United States Attorney, Greensboro, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Linda James Barnes and Charles Phillip James each pled guilty to interstate transportation of stolen goods in violation of 18 U.S.C. § 2314 (1994). Barnes received a 27-month sentence. James received a 30-month sentence. Both appeal their sentences, alleging that the district court clearly erred in determining the loss under USSG § 2B1.1,[1] in finding that both had obstructed justice and neither had accepted responsibility, USSG §§ 3C1.1, 3E1.1, and also erred in ordering restitution in the amount of $7200 for James and $2700 for Barnes. We affirm.

James worked for Mitsubishi Semiconductor America, Incorporated, in Durham, North Carolina, as an equipment technician from 1983 to December 1994. His job involved retesting parts which had failed to meet company specifications. Employees at the Mitsubishi plant assembled several kinds of computer memory modules by attaching varying numbers and types of computer chips (called "devices") to printed memory boards (circuit boards). The finished memory modules were supplied to another Mitsubishi facility in California. The Durham plant also manufactured computer chips, or devices.

In November 1990, James traveled to a computer show in New Jer-

_____

[1] United States Sentencing Commission, Guidelines Manual (Nov. 1995).

2

sey and arranged to sell Mitsubishi memory modules to United Computer Resources (UCR), a New Jersey company. In 1990, Linda Barnes (James' sister), went to work at Mitsubishi in the assembly area. She began assisting James with his scheme in 1991 or early 1992. For a while, she paid Kathy Crabtree, her sister, and Tony Lloyd, an acquaintance, to help assemble memory modules from parts acquired by James and Barnes. Between 1991 and 1994, James sold UCR approximately 19,471 one-megabyte single in-line memory modules (SIMM's) and was paid a total of $447,891. Barnes received about $20,000 from James.

Mitsubishi eventually received a tip that James and Barnes were stealing products and selling them. Barnes' locker was searched in November 1994 and 493 new circuit boards were found in it. Barnes was then fired by Mitsubishi. When interviewed by Federal Bureau of Investigation (FBI) agents, Barnes stated that James had instructed her to steal good products from the assembly area. She would then attach the chips/devices to stolen boards. At first, she claimed that she put the 493 new circuit boards into her locker during a clean-up of the assembly area. Later, she admitted that the boards were to be used to make modules for UCR.

In December 1994, FBI agents confronted James. He admitted selling memory modules to UCR, but said he sold only materials which had been rejected by Mitsubishi and would have been thrown away. He said he was able to fix many rejected boards because test failures were often correctable (when caused by an improperly situated device) and in other cases the board (or device) was functional but was simply too slow to meet Mitsubishi specifications. After James was fired, a search of his work area disclosed 4000 good new devices hidden under some other equipment.

Following James' and Barnes' guilty pleas, a single probation officer prepared the presentence report for both defendants. In both cases, the probation officer recommended no enhancement for loss because the defendants sold "discarded defective modules" which were of no use to Mitsubishi.[2] The government objected to the recommendation, arguing that James' profit should be treated as the amount of loss.

_____

[2] In both cases, the probation officer recommended an offense level of 4, which included a 2-level adjustment for acceptance of responsibility. USSG §§ 2B1.1, 3E1.1. Both defendants were in criminal history category I, which produced a recommended guideline range of 0-6 months.

Barnes and James were sentenced together in four sentencing hearings. Much of the testimony concerned the various products assembled at the plant and the production methods. At the third hearing, the district court advised James and Barnes that it could not accept their assertions that no new materials were taken, stating:

> [Barnes] was positioned to put things together so they wouldn't work, to test things to have false failures. Mr. James was positioned, certainly, for that, because that was primarily what he did. He said he was in charge of the testing process.
>
> Now when you have people who have sold a half million dollars' worth of a product which was stolen, knowing that that product does have a value, knowing that . . . it's good and the employer is not aware of it, or the employer is not aware of the true value, and they are positioned to cause good product to be failed and put in [a reject bin], or they're positioned to take other products, it seems to me like the burden should be on those people to prove what it was they used and the value of what it was they used, because they are the ones uniquely positioned to know.
>
> It appears to me to be absolutely incredible, looking at the evidence that has been presented by the government, looking at the materials in Ms. Barnes' locker, looking at the statement she made to Agent Thomure, that no new product was used in the manufacture of the devices which they sold to UCR. I find that absolutely incredible. Yet I have testimony from each of them that no new product was used.
>
> . . . . [I]t seems to me like the burden can only be so far on the government, and then it is incumbent on those people who are specially positioned to cause the loss, who were the only people positioned to know exactly what was done and with what, it seems to me the burden should be on them to come forward with that.

The court informed James and Barnes that it was inclined to assume that they sold only new materials unless they provided evi-

4

dence of what proportion of their sales were new materials. However, they never admitted taking any new materials. In the end, the district court determined that James and Barnes sold some reworked materials and some new materials. The court found that it could not credit their testimony that only rejected materials were sold. The court found that it could not determine what proportion of the sales to UCR were rejected materials. The court estimated that, if James and Barnes took all good products, the value of what they stole would have been $530,291. On the other hand, if James and Barnes took only rejects during 1991 and 1992 but took good products after that, the value would have been $279,741. Therefore, the court found that James' gross receipts of $447,891 was the "fairest and perhaps the most accurate figure available" for the amount of loss. The court reduced the amount of loss in Barnes' case to $342,149 because she entered the scheme in 1992.

The court found that James and Barnes had obstructed justice by willfully giving false testimony on a material matter. The court thus gave each of them a 2-level adjustment for obstruction of justice and found that neither of them had earned an adjustment for acceptance of responsibility.

The court's findings raised James' offense level to 19 and resulted in a guideline range of 30-37 months. Barnes' offense level was 18 and her guideline range was 27-33 months. The court imposed a 30-month sentence on James and ordered him to make restitution of $7200. Barnes received a 27-month sentence and was ordered to pay $2700 in restitution.

On appeal, James and Barnes first challenge the district court's determination of the loss resulting from their theft. Unless the facts are undisputed, the amount of loss is a factual matter which is reviewed for clear error. See United States v. Chatterji, 46 F.3d 1336, 1340 (4th Cir. 1995). In determining the value of stolen items so as to make the appropriate enhancement under USSG § 2B1.1(b)(1), the district court "need only make a reasonable estimate of the loss, given the available information." USSG § 2B1.1, comment. (n.3). Ordinarily, in a theft case, the loss is the fair market value of the property taken. USSG § 2B1.1, comment. (n.2). This was the approach taken by the probation officer, who accepted James' and Barnes' represen-

5

tation that the stolen materials were all rejects and had no market value. However, the district court found that, "if rejected parts were taken, it did not take much to reconstitute those rejected parts into good, salable parts that went to UCR." The court thus discounted the argument that no marketable materials were stolen and also found that James and Barnes added little value (by way of labor or costs) in making marketable products from however many rejects they stole.

James and Barnes correctly point out that a defendant's gain may not be used as a measure of loss when there is no actual or intended loss to the victim. See Chatterji, 46 F.3d at 1340.[3] However, their argument that the stolen property had no value is incorrect. Whether rejects or new materials, the items James and Barnes stole obviously had a fair market value of nearly half a million dollars because James was able to sell them for that amount to UCR. Even if all the stolen materials were genuine rejects which Mitsubishi would not have marketed, they still had a market value. Whether Mitsubishi intended to sell them or recycle them is not determative. Mitsubishi suffered a loss by having its products stolen and the sale of those products established their fair market value.[4] For these reasons, we find that the Defendants' gain was a proper measure of loss and that the district court did not clearly err in determining that there was a loss of $447,891 in James' case and $342,149 in Barnes' case. We also find that the court did not improperly shift the burden of proof by inviting James and Barnes to explain how much of what they stole was good, new product.

James and Barnes next contend that the court erroneously equated their gain with the victim's loss in determining restitution, while the statute permits restitution only for the victim's actual loss. See 18 U.S.C. § 3663(b)(1) (1994). However, the district court found as a fact that James and Barnes stole products which were not defective

_____

[3] Like most cases in which loss is an issue, Chatterji involved an enhancement under USSG § 2F1.1. Under both USSG § 2B1.1 and USSG § 2F1.1, loss is the value of the money, property, or services unlawfully taken. See USSG § 2F1.1, comment. (n.7).

[4] Presumably, if James stole a painting which the artist had decided to destroy as not up to his standards, James would argue in court that the painting had no value even if he had been able to sell it for $5 million.

6

or substandard. The amount of restitution ordered was clearly tied to the court's determination that good products were stolen and sold, causing a monetary loss to Mitsubishi. It is unlikely that the small amount of restitution ordered ($7200 for James and $2700 for Barnes) is greater than the value of good products stolen and not recovered. Thus, we find that the court ordered restitution only for actual loss to the victim.

Finally, James and Barnes contend that they testified truthfully when they told the court that they took only rejected materials. Therefore, they argue, the court clearly erred in finding that they obstructed justice. Because there was evidence that James and Barnes stole good, new products from Mitsubishi, the court did not clearly err in finding that they testified untruthfully about a material matter and awarding each an adjustment for obstruction of justice. See USSG § 3C1.1, comment. (n.3(b)). As a consequence of the obstruction of justice finding, an adjustment for acceptance of responsibility would not have been appropriate in either case. USSG § 3E1.1, comment. (n.4).

The sentences are therefore affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

7